UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BRANDON L. SANFORD

                                 CIVIL ACTION

v.

                                 NO. 14-144-JWD-RLB

TROPICANA ENTERTAINMENT, INC.,
ET AL.

## RULING AND ORDER

       This matter comes before the Court on the Motion for Summary Judgment (R. Doc. 24) filed by Defendants Tropicana Entertainment, Inc., ("Tropicana") and Catfish Queen Partnership in Commendam ("Catfish") (collectively, "Defendants"). Plaintiff Brandon L. Sanford opposes the motion. (R. Doc. 33). Oral argument was conducted on October 29, 2015. (*See* R. Doc. 41).

       Plaintiff brings a claim for interference under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). As to Tropicana, Defendants submitted unrebutted evidence that Tropicana was not Plaintiff's employer, and Plaintiff does not oppose dismissal. Accordingly, Plaintiff's claims against Tropicana are easily dismissed.

       As to Catfish, the Plaintiff must prove six elements to establish a *prima facie* case for interference. One of these elements is that Plaintiff was entitled to leave because of a serious health condition that made him unable to perform the functions of his position.

       Here, the Plaintiff has failed to demonstrate a genuine issue of material fact as to this element. Specifically, the Plaintiff has failed to come forward with summary judgment evidence such that a reasonable juror could conclude that he was unable to perform the functions of his job. Because this is fatal to Plaintiff's claim, the Defendants' motion is granted, and Plaintiff's claims are dismissed with prejudice.

I.    **Factual Background**

A. **Plaintiff's employment**

Plaintiff Brandon Sanford started working at the Belle of Baton Rouge Casino (the "Belle") on October 16, 2006. (R. Doc. 33-1, p. 6). Plaintiff started as a security officer and was promoted to a security dispatch officer, which was the position he held at the time he was terminated. (R. Doc. 33-1, p. 7).

Plaintiff alleges in his complaints that both Catfish and Tropicana are his employers. (*See* R. Docs. 1, p. 2 and 9, p. 2). However, Defendants have submitted the affidavit of the Director of Human Resources at the Belle. This affidavit indicates that Plaintiff's actual employer was Catfish and that Tropicana was never Plaintiff's employer. (R. Doc. 24-5). This evidence is unrebutted by Plaintiff.

B. **Plaintiff's requests for leave**

Plaintiff testified that he made six requests for leave from 2011 to 2013. (R. Doc. 33-1, p. 13-14). Only the last three are relevant here. In December 2012, Plaintiff submitted a letter to two Belle employees. (*Id.*). An unauthenticated[1] Daily Activity report from the Belle dated December 25, 2012, reflects the following entry: "As instructed by George Robinson and Eugene Smith in October (2012), I Brandon Sanford request my FMLA papers so I can get treated for my blood pressure and fluid in my legs." (R. Doc. 33-8). Additionally, on January 1, 2013, the Plaintiff told someone that he was trying to see the doctor and requested his FMLA leave. (R. Doc. 33-1, p. 13-14).

---

[1] Most of Plaintiff's exhibits are not authenticated. (See R. Docs. 33-2, 33-3, 33-4, 33-5, 33-6, 33-7, 33-8, 33-9, 33-10, 33-13). Thus, they are not proper summary judgment evidence. *See, e.g., Spears v. United States*, No. 5:13-CV-47-DAE, 2014 WL 3513203, at *4 (W.D. Tex. July 14, 2014); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2722 (3d ed. 2014). However, since these documents are ultimately not material to the Court's decision, the Court will discuss them to provide background for the Court's ruling.

Concerning the sixth attempt, Plaintiff testified that, on January 15, 2013, he came back to work and told Alecia Williams Riley of the Belle that "I need FMLA . . . I need my FMLA papers, could you please send them to my doctor or get them over here as fast as you can," but Plaintiff stated that "nothing never happened." (R. Doc. 33-1, p. 10). According to Plaintiff, Riley said, "okay, I will do that, because [Plaintiff's] doctor['s] information was in the system already." (R. Doc. 33-1, p. 13).

### C. Plaintiff's visits to the doctors

#### 1. January 17, 2013, visit with Dr. Guarisco

Plaintiff submitted an unauthenticated document entitled "Stanocola Significant Problem List" that appears to be a medical record from Dr. Moreno's office. (R. Doc. 33-10). The record states that, on January 17, 2013, Plaintiff came into the clinic wanting Dr. Moreno to fill out FMLA paperwork. (R. Doc. 33-10). Plaintiff had not been there since January 2011. (R. Doc. 33-10). Another doctor, Dr. Guarisco, authorized a medication refill until Plaintiff could be seen on January 21, 2013. (R. Doc. 33-10). The note says that Plaintiff's blood pressure was checked with an automatic blood pressure cuff and that the cuff would not read due to high blood pressure. (R. Doc. 33-10). Plaintiff's blood pressure manually was 195/130. (R. Doc. 33-10). According to the document, Plaintiff refused to go to the ER, though Candice Sager, CMA, advised under Dr. Guarisco for Plaintiff to go. The first entry note is signed Candice Sager, CMA.

On the same document, there appears to be a second entry in a different handwriting that is signed by J. Kaiser, RN (though there is no new date). (R. Doc. 33-10). This entry says "Spoke with Mr. Sanford regarding his blood pressure being high and encouraged him to go to ER." (R. Doc. 33-10). According to the entry, Plaintiff said he would not go "today due to

family issues" but would go "in the A.M."  Kaiser told him to pick up his medications from the pharmacy and begin taking them, and the note reflects a verbalized understanding and agreement. (R. Doc. 33-10).

### 2. January 21, 2013, visit with Dr. Moreno

Plaintiff testified that he then went to Dr. Moreno on January 21, 2013. (R. Doc. 33-1, p. 10).  Plaintiff said he asked Dr. Moreno to complete the FMLA paperwork and that it was completed. (R. Doc. 33-1, p. 15).  Plaintiff believed he was sick and needed time off from work because he "was experiencing the same symptoms that [he] had when [he] took the leave in 2009, 2010." (R. Doc. 33-1, p. 15).

Plaintiff submitted unauthenticated documents purporting to be medical records from his January 21 visit to Dr. Moreno.  (See R. Doc. 33-9).  These documents show he had "HTN Stage II-Uncontrolled." (*Id.*).  This refers to hypertension. (*See* R. Doc. 24-8, p. 24).

### a.  The FMLA Certification Forms

Defendants attach to their motion for summary judgment copies of the FMLA medical certifications prepared by Dr. Moreno. (Docs. 24-6 and 24-7).  One of the documents is dated January 21, 2013, and is not signed. (R. Doc. 24-6, p.4).  Most significantly, on the document, there is a question, "Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?" with a blank for "yes" and "no," and the blank for "no" is checked.  (R. Doc. 24-6, p. 3).  There is also a question, "Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions," and the blank with "no" is checked. (R. Doc. 24-6, p. 3).  There is also a question under it saying, "Is it medically necessary for the employee to be absent

4

from work during the flareups?" and "yes" is checked with the explanation, "If Pt is feeling bad needs to follow in clinic." (R. Doc. 24-6, p. 3).

The other certification form is signed and dated January 21, 2012, (R. Doc. 24-7), though Dr. Moreno testified that the date was simply an error and that it should have been January 21, 2013. (R. Doc. 24-8, p. 16). The information in this form is substantially the same as the other certification form, except that the question about flare-ups is blank with "NA" [not applicable] written next to it, and there is no mention of an open wound. (*Compare* Docs. 24-6 and 24-7).

### 3. Plaintiff's inability to perform his job

During his deposition, Dr. Moreno was asked several times about the certification forms and about whether Plaintiff could perform the functions of his job, and Dr. Moreno stated numerous times that he could.  Specifically, Dr. Moreno testified:

A:     I didn't think any restrictions then.

Q:     You didn't think he had any restrictions?

A:     No.

Q:     You didn't think he needed any time off of work?

A:     No.  I don't think I put that on the form.  Just the way you read it, that's
        the way I filled it out.

(R. Doc. 24-8, p. 17).  Further, Dr. Moreno was asked, "[Plaintiff] didn't need reduced hours, correct?", and Dr. Moreno responded, "That's correct." (R. Doc. 24-8, p. 18).  Similarly:

Q:     Okay.  The forms that were filled out don't provide him any leave from
        work for any extended period of time.  You were not at this point saying
        you need to take a month off, correct?

A:     No.

Q:     You, in fact, did not even recommend any reduced hours or reduced
        schedule at this time.

[objection]

A:      No.

Q:      The only issue here is it says if he's feeling bad, he needs to come to the
        clinic, correct?

A:      That's correct.

(R. Doc. 24-8, p. 18).  Dr. Moreno was asked, "And also on the FMLA forms, there's no

restrictions, no reduced work hours.  All it is is he needs to follow up with you, correct?", and

Dr. Moreno replied, "That's correct."

        In fact, counsel for Plaintiff specifically asked Dr. Moreno what his response would be if

the forms asked whether Plaintiff could perform the functions of his job because of his high

blood pressure, and Dr. Moreno testified consistently with the above:

Q:      If they asked you the question, and based upon the blood pressure
        you had that day, did you think the employee was able to perform
        his job functions based on the way you examined him that day,
        Doctor?

A:      His blood pressure then, it was one sixty-six over one fourteen.
        Yes.  He should be able to function with that pressure.  He had
        much, much higher pressures in the past, and he was still
        functional, to go and work.  So I just wrote his chronic conditions.
        That's what I'm saying.  He could have been functional, yes.

(R. Doc. 24-8, p. 29).

        Indeed, there was only one time in which Dr. Moreno expressed anything that could even

remotely be construed as contrary to the above statements.  During his deposition, Plaintiff's

counsel said that Dr. Moreno's records indicate that, on October 14, 2010, Plaintiff's blood

pressure was one eighty four over one twelve, Dr. Moreno said that was "high." (R. Doc. 24-8, p.

6

29-30).[2]  On January 21, 2013, his blood pressure was one sixty-six over one fourteen, which

Dr. Moreno said was also high. (R. Doc. 24-8, p. 30).  Dr. Moreno said that both blood pressures

are "Still causing medical, still causing some organ, probably organ damage somehow." (R. Doc.

24-8, p. 30).  Dr. Moreno then testified:

> Q:     So being in that state, it is possible that, based upon your previous
>        granting of FMLA leave, that he would be eligible for FMLA leave
>        according to the way that you had sent him off before, is that
>        correct?
>
> A:     That's a possibility, yes.

(R. Doc. 24-8, p. 30).

### D.  Activity at the Belle after Plaintiff's doctors' visits

After the January 21, 2013, visit, Plaintiff's mother delivered the paperwork to Catfish's

human resources. (R. Doc. 33-1, p. 10).  Plaintiff submits an unauthenticated email dated January

25, 2013, from Michelle Newman (Director of Human Resources at the Belle) to Patricia

McCreary, purportedly an employee at the Belle. (R. Doc. 32-2).  The letter details, among other

things, how the FMLA certification paperwork was received, the Plaintiff's mother's numerous

attempts to verify receipt of the paperwork, and discussions at the Belle about the discrepancy in

the paperwork.

Additionally, Newman testified that the forms were not completed correctly because

there was a signature missing from the form. (R. Doc. 33-11, p. 5).  The forms had different

dates and different diagnoses. (R. Doc. 33-11, p. 5).  Further, they were completed by a

generalist who was no longer there. (R. Doc. 33-11, p. 5).  Newman said the documents that

were sent were not sufficient for her to make a determination about whether he was certified for

FMLA leave. (R. Doc. 33-11, p. 6).  As far as she knew, no additional paperwork was sent in to

---

[2] The Court notes that there is nothing in the record actually indicating what the Plaintiff's blood pressure was in
October of 2010, aside from Plaintiff counsel's representation during the Plaintiff's deposition.

them. (R. Doc. 33-11, p. 7).  As far as she knew, Catfish was never able to make a determination as to Mr. Sanford's request for FMLA leave. (R. Doc. 33-11, p. 7).

Andrell Ward, purportedly another employee at the Belle, testified that she received two certifications from Plaintiff's physician and that she reviewed them to ensure they were accurate, complete, and met with the procedures and policies. (R. Doc. 33-12, p. 5).  After reviewing them, she found out that they were incomplete and did not specify a need for leave. (R. Doc. 33-12, p. 5-6). She said they were incomplete because they did not have a signature from a healthcare provider. (R. Doc. 33-12, p. 6).  She said that, because the forms were incomplete, they were unable to determine whether or not leave was applicable to the request that they received. (R. Doc. 33-12, p. 6). That is, she could not determine if Plaintiff met the policies and procedures to obtain FMLA leave. (R. Doc. 33-12, p. 6-7).  She said her next course of action was to reach out to the healthcare provider and ask them to complete the documents with the questions that they had specified, one of which was a signature missing and the other was a period of incapacitation. (R. Doc. 33-12, p. 7).

Additionally, Plaintiff submits an unauthenticated fax cover sheet from Patricia McCreary (HR Generalist) to Dr. Moreno dated January 25, 2013.  The notes/comments section states, "Dr. Moreno, Please review attached documents that were faxed to our office without your signature.  There were discrepancies in the forms, including the date completed, listing of a 'wound' and again no physician's signature.  Your cooperation in this matter is greatly appreciated.  If you should have any questions, please do not hesitate to contact me." (R. Doc. 33-3, p. 1).  The fax includes the "Certification of Health Care Provided for Employee Serious Health Condition (Family and Medical Leave Act)," which appear to be the same FMLA Certification documents that Dr. Moreno filed out.

8

### E.  Plaintiff's calls and communications with the Belle's HR

Afterword, Plaintiff testified that he got a call telling him that he was terminated on January 15 and that he never returned after January 8, 2013.  (R. Doc. 33-1, p. 10).  Plaintiff said that was impossible because he worked January 9 and 15, 2013. (R. Doc. 33-1, p. 10-11).  Plaintiff testified that there was a "three-five minute lapse in the call," and the Catfish employee then said that Plaintiff was terminated on January 15, 2013.  (R. Doc. 33-1, p. 11).  Plaintiff again denied this and said (somewhat unclearly) he still had his gaming badge and that no one told him because he was there on January 15, 2013.  (R. Doc. 33-1, p. 11).  According to Plaintiff, they said (again, somewhat unclearly), "you mean confiscate his gaming license." (R. Doc. 33-1, p. 11).

Plaintiff then testified that Michelle Newman, the HR Director, said Plaintiff was terminated until he got the papers from the doctor signed because the doctor did not sign off on them. (R. Doc. 33-1, p. 11).  Plaintiff responded that he saw the doctor sign the papers, and Newman denied this. (R. Doc. 33-1, p. 11).  Sanford then said he would get everything taken care of. (R. Doc. 33-1, p. 11)

According to Plaintiff, Patricia McQuery then called him and said that she would fax the paperwork to the doctor and get everything taken care of because she knew he was sick, could not walk, and could not come to the Belle and get the papers. (R. Doc. 33-1, p. 11).  Plaintiff said okay. (R. Doc. 33-1, p. 11).

Plaintiff testified that he "kept calling for weeks, weeks and weeks.  No one ever called me back.  No one ever said anything." (R. Doc. 33-1, p. 12).  Plaintiff said the swelling in his legs went down so he came to the Belle on February 15, 2013. (R. Doc. 33-1, p. 12).   At that point, someone at the Belle stated that Plaintiff was not eligible for FMLA leave. (R. Doc. 33-1,

p. 12).  According to Plaintiff, she said "that you have to go take these papers to Dr. Moreno and this and that." (R. Doc. 33-1, p. 12).

Plaintiff attaches the February 16, 2013 paperwork, though the documents are unauthenticated.  There is a letter attached "To Whom it May concern" re: Brandon Sanford which states, "This letter confirms that Mr. Sanford's last day worked for the Belle of Baton Rouge Casino & Hotel was January 8, 2013 as a Security Officer.  If you should need additional assistance, please do not hesitate to contact Human Resources at [phone number]." (R. Doc. 33-13, p. 1).  The FMLA paperwork states that Plaintiff must return the "following information" by March 2, 2013, and such information was "[s]ufficient certification to support your request for FMLA leave." (R. Doc. 33-13, p.2).  The document states that a "certification form that sets forth the information necessary to support your request ___ is / _X__ is not enclosed." (R. Doc. 33-13, p.2).  However, a blank certification form appears attached. (R. Doc. 33-13, p. 4-6),

**F.  Reasons why the paperwork was incomplete.**

Plaintiff testified he did not complete the paperwork because his insurance had been canceled, so he had no insurance to go back and see Dr. Moreno. (R. Doc. 33-1, p. 17).  He testified that, if he still had insurance, he would have gotten the paperwork completed. (R. Doc. 33-1, p. 17).  Further, on January 31, 2013, Catfish sent an e-mail to his insurer and "told them to back date my insurance on January the 17th." (R. Doc. 33-1, p. 12).  Plaintiff attaches an unauthenticated letter from BlueCross BlueShield of Alabama dated July 17, 2013, which states that his coverage was "canceled on January 17, 2013." (R. Doc. 33-5).

Plaintiff also testified that he talked to Dr. Moreno's nurse and found out that Andrell Ward called them on January 24, 2013, and told them not to do the paperwork because PLaintiff was terminated.  (R. Doc. 33-1, p. 12, 17).  Plaintiff claims that was another reason he did not

complete the February 15, 2013 paperwork. (R. Doc. 33-1, p. 17). Plaintiff attaches to his

opposition an unauthenticated "Stanocola Medical Clinic Progress Notes" on Sanford Brandon

dated January 24, 2013 saying "FMLA Papers – Belle Casino – HR . . . pt was terminated

1/15/13 for job abandonment per HR." (R. Doc. 33-4). The Physician's orders/follow up states,

"Cannot approve FMLA 2012 … Fired … How?"

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its

opponent must do more than simply show that there is some metaphysical doubt as to the

material facts . . . [T]he nonmoving party must come forward with 'specific facts showing that

there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citations omitted). The non-

mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by

only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)

(citations and internal quotations omitted). "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of
> the witnesses, weigh the evidence, or resolve factual disputes; so long as the
> evidence in the record is such that a reasonable jury drawing all inferences in
> favor of the nonmoving party could arrive at a verdict in that party's favor, the
> court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir.1991).

11

### III.   Discussion of Claim against Tropicana

Tropicana argues that it is entitled to summary judgment because it was not Plaintiff's employer, and it has submitted unrebutted evidence supporting this fact. In fact, Plaintiff expressly states that it "does not offer any Opposition to Defendant Tropicana['s] . . . request for Dismissal from this matter." (R. Doc. 33, p. 12). Given this concession, Defendants' motion is granted, and the interference claim against Tropicana is dismissed with prejudice.

### IV.   Discussion of Claim against Catfish

#### A.  Parties' arguments

Defendants argue that Plaintiff's claim fails for two reasons. First, Plaintiff is not "entitled to leave" because he was able to perform the functions of his job. Second, Plaintiff failed to complete the medical certification forms prior to his termination.

Plaintiffs counter that he was "terminated without having had the opportunity to provide the requested paperwork to establish his entitlement to FMLA leave." (R. Doc. 33, p. 9). Plaintiff essentially contends that Catfish's employees represented numerous times that he would be entitled to leave and that they would handle the paperwork for him, yet they did nothing. Further, they canceled his insurance before giving him an opportunity to rectify the mistakes. Plaintiff also argues that Catfish violated FMLA regulations requiring an employer to give notice in writing about the deficiencies in certification forms and seven days to cure the deficiencies. Finally, Plaintiff argues that his visits with Dr. Gaurisco and Dr. Moreno demonstrate a genuine issue of material fact with respect to whether he was unable to perform the essential functions of his job.

Defendants reply that Plaintiff only shows a mere possibility that he could not perform his job functions and that Dr. Moreno's testimony is clear and unambiguous that he could. Defendants also re-urge that Plaintiff failed to timely provide the appropriate certifications.

**B. Analysis**

### 1. Unable to perform the functions of his job.

The FMLA provides, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter" of the FMLA. 29 U.S.C. § 2615. To establish a *prima facie* case of interference, a plaintiff must show that (1) he was an eligible employee, (2) the defendant was an employer subject to the FMLA's requirements, (3) he was entitled to leave, (4) he gave proper notice of his intention to take FMLA leave, (5) the defendant interfered with the benefits to which he was entitled under the FMLA, and (6) he was prejudiced as a result. *McCollum v. Puckett Mach. Co.*, --- F. App'x. ---, 2015 WL 5817650, at *4 (5th Cir. 2015) (per curiam) (citing *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir.2013) (per curiam)). Here, the key issue is the third element - entitlement to leave.

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Defendants' briefs and argument at the hearing on this motion make clear that they are not questioning whether Plaintiff had a "serious health condition." Rather, the key question is whether the Plaintiff was "unable to perform the functions of" his position.

As explained above, Dr. Moreno clearly testified that he was able to perform the

functions of his job.  Without repeating every instance of Dr. Moreno's testimony to this effect,

the Court notes that the following is the clearest example:

> Q:    If they asked you the question, and based upon the blood pressure
>       you had that day, did you think the employee was able to perform
>       his job functions based on the way you examined him that day,
>       Doctor?
>
> A:    His blood pressure then, it was one sixty-six over one fourteen.
>       Yes.  He should be able to function with that pressure.  He had
>       much, much higher pressures in the past, and he was still
>       functional, to go and work.  So I just wrote his chronic conditions.
>       That's what I'm saying.  He could have been functional, yes.

(R. Doc. 24-8, p. 29).  Without even looking at the medical certification forms and whether

Plaintiff should have had an opportunity to correct them, Plaintiff's claim fails on this basis.

Plaintiff has presented only two pieces of evidence supporting a finding that he was

entitled to leave.  Neither piece of evidence is enough to save the Plaintiff.

First, Plaintiff submitted the document entitled "Stanocola Significant Problem List"

reflecting his January 17, 2013, visit with Dr. Guarisco.  (R. Doc. 33-10). Preliminarily, the

document is unauthenticated; consequently, it is not proper summary judgment evidence. *See,

e.g., Spears v. United States*, No. 5:13-CV-47-DAE, 2014 WL 3513203, at *4 (W.D. Tex. July

14, 2014); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and

Procedure* § 2722 (3d ed. 2014).

But even assuming this document was properly before the Court, this evidence does not

create an issue of material fact.  The document merely shows that Plaintiff's blood pressure was

very high, that Dr. Guarisco and his staff advised the Plaintiff to go to the emergency room, and

that Plaintiff said he would not go on that day because of "family issues." (R. Doc. 33-10).  The

note does not reflect that the Plaintiff needed to take any time off from work at all, except for a

14

brief trip to the emergency room.  There is no instruction to stay home and rest or anything of

that nature.  Even construing the facts in a light most favorable to the Plaintiff, these facts alone

are not such that a reasonable juror would conclude that the Plaintiff was unable to perform his

job so as to be entitled to FMLA leave.

The second piece of evidence that the Plaintiff relies upon is Dr. Moreno's testimony that

it is "possible" that he would need leave if his blood pressure were as high as it was when he

took FMLA leave previously.  Unfortunately for Plaintiff, this too fails.

To prevail on an interference claim, the Plaintiff must prove the above elements –

including entitlement to leave – by a preponderance of the evidence.  *See Ford-Evans v. United*

*Space Alliance, LLC*, No. 4:04-CV-3344, 2007 WL 4413716, at *2 (S.D. Tex. Dec. 14, 2007)

*aff'd,* 329 F. App'x 519 (5th Cir. 2009) (citations omitted); *see also McCoy v. Orleans Par. Sch.*

*Bd.*, No. CIV.A.02-2510, 2004 WL 831141, at *3 (E.D. La. Apr. 15, 2004) (denying motion for

summary judgment and explaining, "To state a claim for interference with her substantive rights

under the [FMLA], [plaintiff] must establish by a preponderance of the evidence that she was

entitled to the benefit denied." (citations omitted)).

Numerous courts in this Circuit have recognized in other contexts that mere possibilities

do not satisfy the preponderance standard.  *See, e.g., Smith v. Ole Man River Towing, Inc.*, 62

F.3d 395 (5th Cir. 1995) (per curiam) (citation omitted) (affirming district court's denial of

damages for future pain and suffering in a Jones Act and unseaworthiness case and stating,

"possibility alone cannot serve as the basis for recovery, as mere possibility does not meet the

preponderance-of-the-evidence standard."); *Bertaut v. United States*, 852 F. Supp. 523, 530

(E.D. La. 1994) (denying recovery in Federal Tort Claims Act case and stating, "At best, the

evidence shows that [plaintiff] only "possibly" had [a certain medical condition]. Plaintiff has

failed to prove by a preponderance of the evidence that she ever had [that condition] rather than some other equally (if not more) plausible diagnosis  . .").

The Court is persuaded by these cases.  The Plaintiff must do more than show the mere possibility that he is entitled to FMLA coverage.  He has failed to do so.

The Plaintiff contended at oral argument that the "mere possibility" language must be read in the context of the entire exchange including Dr. Moreno's statement that Plaintiff's blood pressure could be high and that such high blood pressure could or would cause organ damage. But these statements too do not establish that the Plaintiff was unable to perform the functions of his job.  Again, Plaintiff has not met his burden.

In sum, Plaintiff simply has no evidence affirmatively demonstrating that he was unable to perform his job.  Without this, the Plaintiff has failed to demonstrate a prima facie case of interference. As a result, Catfish is entitled to summary judgment.[3]

### 2. Equitable estoppel

Plaintiff is in essence arguing that Catfish's conduct should prevent him from having to prove that he was entitled to leave.  This warrants a discussion of equitable estoppel.

In *Minard v. ITC Deltacom Communications, Inc.*, 447 F.3d 352 (5th Cir. 2006), the Fifth Circuit laid out the standard for equitable estoppel:

> an employer who without intent to deceive makes a definite but erroneous representation to his employee that she is an "eligible employee" and entitled to leave under FMLA, and has reason to believe that the employee will rely upon it, may be estopped to assert a defense of non-coverage, if the employee reasonably relies on that representation and takes action thereon to her detriment.

*Id.* at 359.

The Court first notes that the Plaintiff did not invoke this doctrine by name.  Plaintiff also failed to make any allegation concerning equitable estoppel in his complaint or amended

---

[3] Given this finding, the Court will not address whether the Plaintiff provided proper certification under the FMLA.

complaint. (*See* Docs. 1, 9).  Thus, it is questionable whether the Court should even consider this

argument. Indeed, the Fifth Circuit has explained:

> the party asserting equitable estoppel, at the very least, usually asserts the
> argument at *some* stage in the proceedings and alleges the necessary elements for
> equitable estoppel. *See, e.g., Huseman v. Icicle Seafoods, Inc.,* 471 F.3d 1116,
> 1122 (9th Cir.2006); *Marks v. Newcourt Credit Group, Inc.,* 342 F.3d 444, 456
> (6th Cir.2003); *see also F.D.I.C. v. Royal Park No. 14, Ltd.,* 2 F.3d 637, 641 (5th
> Cir.1993) (implying that Rule 8 requires the pleading of estoppel that is part of
> the plaintiff's affirmative case).

*Ford-Evans*, 329 F. App'x at 526.

In *Ford-Evans*, the Fifth Circuit expressly left "open the possibility that [it] may decide

to apply equitable estoppel *sua sponte* in a future case," 329 F. App'x at 526 n. 3.  However, the

Court found that, "[e]ven assuming *arguendo* that it could *sua sponte* apply the principles of

equitable estoppel, the record [did] not support its application." *Id.* at 526.

Similarly, the Court finds that, even if it were to invoke equitable estoppel (which it is not

required to do), the Plaintiff still cannot recover.  *Minard* requires "that the party claiming the

estoppel must have relied on its adversary's conduct in such a manner as to change his position

for the worse." *Id.* at 358 (citation omitted).  Even if Plaintiff had not relied on Catfish's

representations that it would complete the paperwork, nothing would have changed.  Dr.

Moreno's unrebutted deposition testimony clearly and unambiguously demonstrated that he

thought Plaintiff was able to perform his job.  Thus, from a pure causation standpoint, Plaintiff

never changed his position for the worse; ultimately, the Plaintiff would never be certified by Dr.

Moreno.

Additionally, "the defendant-employer must have actually represented to the plaintiff-

employee *that her leave was covered and/or that she was protected by the FMLA* in order to

equitably estop the defendant from arguing in court that FMLA does not specifically cover the

17

plaintiff-employee and/or her leave." *Ford-Evans*, 329 F. App'x at 527. Here, Catfish

represented that it would present the paperwork to Dr. Moreno because the Plaintiff was sick.

However, there is no evidence in the record of Catfish ever telling the Plaintiff that he would be

entitled to leave.[4] This is an important distinction; again, even if Catfish had presented the

paperwork to Dr. Moreno, the doctor still would not have certified that Plaintiff was unable to

perform the functions of his job.

In sum, even if the Court were to consider the doctrine of equitable estoppel, the Plaintiff

would not prevail. Plaintiff's position did not change because of any of Catfish's representations,

and Catfish never said Plaintiff was entitled to leave. For these reasons as well, Defendants'

motion is granted.

### V.     Conclusion

Accordingly,

**IT IS ORDERED** that Motion for Summary Judgment (R. Doc. 24) filed by Defendants

Tropicana Entertainment, Inc., and Catfish Queen Partnership in Commendam is **GRANTED**;

and

**IT IS FURTHER ORDERED** that Plaintiff Brandon L. Sanford's claims are

**DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on <u>November 13, 2015</u>.

> _____
> **JUDGE JOHN W. deGRAVELLES**
> **UNITED STATES DISTRICT COURT**
> **MIDDLE DISTRICT OF LOUISIANA**

---

[4] The closest Plaintiff comes to producing such evidence is his testimony that Patricia McQuery called him that she would fax the paperwork to the doctor and get everything taken care of because she knew he was sick, could not walk, and could not come to the Belle and get the papers. (R. Doc. 33-1, p. 11). However, Catfish's employee does not state he will be unable to return to performing his job functions.

18